GARRISON, Judge.
Simon S. Queen was convicted of manslaughter in violation of R.S. 14:31 and sentenced to 18 years at hard labor. He was further ordered to pay costs of $90 or in default thereof spend 90 days in jail. Queen was later declared indigent and OIDP was ordered to take over the appeal.
On appeal, defendant raises one specification of error, namely that now that the defendant has been declared indigent, the 90 days in lieu of court costs provision should be deleted. This assignment of error is correct and the sentence herein should be and is hereby amended to delete the $90 or 90 days provision. See: State v. Woods, 526 So.2d 443 (La.App. 4th, 1988); State v. Bates, 507 So.2d 1286 (La.App. 4th, 1987); State v. Barnes, 496 So.2d 1056, 1059 (La.App. 4th, 1986).
At approximately 11:40 p.m. on November 9, 1985, police officers were called to 1884 Lauradale Street to investigate a murder. At that address, they discovered Ricardo Torregano with a gunshot wound to the head, Corrine Charles with a gunshot wound to the chest, and the body of Joseph Smith lying in the kitchen with gunshot wounds to the neck and the chest. Shortly after the police arrived, it was learned that the defendant, Simon Queen, had approached a security guard at Charity Hospital and had confessed that he had killed five people. A gun was found on the front seat of Queen’s car. Queen subsequently gave a statement to the police in which he admitted shooting Torregano and Smith, but only in self-defense.
Through testimony at trial, it was learned that Queen and Mrs. Charles were living together at the Lauradale Street home with Mrs. Charles’ young son Christopher. Queen and Mrs. Charles had been intimate over twenty years earlier, and this alliance had produced their daughter, Karen Smith. However, they had never married each other but had instead drifted apart. Mrs. Charles later married, and when her husband subsequently died, she and Queen became involved again, with Queen moving in with her in the early 1980’s.
On the evening of the shootings, Queen returned to their house after an evening of drinking to find that Mrs. Charles was not yet home from her evening of drinking with her daughter Karen, her brother Ricardo Torregano, and his fiancee Lollita. However, Mrs. Charles son, Joseph Smith (also known as “Chuckie”), his pregnant wife Dominica (also known as “Crystal”), and Christopher were present. When Queen was told that Mrs. Charles was not yet home, he went into their bedroom and closed the door. Mrs. Charles arrived shortly thereafter, and when she knocked on the bedroom door, a shot rang out. Mrs. Charles retreated to the kitchen, joining Torregano and Joseph. Queen soon joined them, carrying both his own gun as well as Mrs. Charles’ gun. Queen sat down at the kitchen table, unloaded Mrs. Charles’ gun, and put it on the table. Karen entered the kitchen, and when Queen put one of the guns to her head, she left the room. Joseph and Torregano began telling Mrs. Charles that she should end her relationship with Queen. Mrs. Charles started walking toward the adjoining living room when suddenly Queen began firing, striking Joseph and Mrs. Charles. Torre-gano grabbed Mrs. Charles’ empty gun from the table, pointed it at Queen, and pulled the trigger. Queen shot him and then left the house. Torregano made his way outside where he was found by the police. Both Mrs. Charles and Torregano maintained that neither he nor Joseph made any threatening remarks or movements toward Queen prior to the shootings.
Queen admitted the shootings, but he contended that they happened in self-defense. He testified that earlier on the day of the shootings he had returned to the house and had seen Joseph, who acted nervously and appeared to be trying to tell him something. However, Joseph left *101 without disclosing what was bothering him. Queen admitted that he had spent most of the day drinking and had visited several bars on the evening of the shooting. Queen testified that when he arrived home at approximately 11:00 p.m., he discovered that Mrs. Charles was not yet home, and he decided to unload their guns for “safety.” He maintained that the shot which came through the bedroom door was the result of a shell which had jammed in the gun and which accidently discharged just as Mrs. Charles knocked on the door. He testified that he exited the bedroom carrying both guns to discover whether Mrs. Charles was unharmed. He testified that he joined her, Joseph and Torregano in the kitchen, and he “playfully” put Mrs. Charles’ empty gun to Karen’s head when she entered the kitchen. After Queen gave Mrs. Charles her unloaded gun, Joseph and Torregano began telling her that she should end her relationship with Queen. She indicated that she was going to move out of the house, and Queen told her he would move instead.
Queen testified that after Mrs. Charles left the room, he went to the adjoining living room and sat down in front of the television. Torregano joined him, and Queen placed his gun on a nearby stereo. Joseph entered the room and stood near Mrs. Charles’ gun, which Queen contended had been reloaded. Joseph once again began telling Queen he should break up with Mrs. Charles or he would get hurt. Torre-gano told Joseph, “No, not now.” Queen testified that he became afraid, and he lunged for his gun at the same time Torre-gano reached for it. He maintained that as he bumped into Torregano, his glasses flew off and the gun went off, striking Torrega-no. Queen testified that before he lost his glasses, he saw Joseph reach for Mrs. Charles’ gun. He testified that he fired wildly, apparently striking Joseph. He did not know, however, that Mrs. Charles had also been hit. Queen testified that as he was leaving the house, he saw Torregano pick up Mrs. Charles’ gun and point it, but the gun merely clicked. Queen then left the house, intending to turn himself in to the police. However, he decided not to walk into police headquarters carrying a gun, and instead he surrendered to the security guard at Charity Hospital.
Upon a full and complete examination of the record on appeal, there are no errors patent on the face of the record other than the sentencing issue discussed above and the evidence was sufficient to convict.
For the reasons discussed, defendant’s conviction is affirmed and the sentence is amended to delete the provision imposing extra jail time in lieu of the payment of court costs.
AMENDED AND AFFIRMED.